**SALT LAKE COUNTY ex rel. COUNTY BOARD OF EQUALIZATION OF SALT LAKE COUNTY, State of Utah, Petitioner,**

v.

**STATE TAX COMMISSION OF UTAH ex rel. BELL MOUNTAIN CORPORATION, Respondent.**

No. 880447.

Supreme Court of Utah.

Sept. 30, 1991.

---

David E. Yocum, Karl L. Hendrickson, Bill Thomas Peters, Salt Lake City, for Salt Lake County.

R. Paul Van Dam, Bryce H. Pettey, Salt Lake City, for State Tax Com'n.

Clark Waddoups, Roger D. Henriksen, for Bell Mountain Corp.

HOWE, Associate Chief Justice:

This case is before us on a writ of review to the Utah State Tax Commission. Salt Lake County seeks review of a decision of the Commission that seven contiguous parcels of vacant land totalling approximately 431.41 acres in Salt Lake County qualified for assessment under the Farmland Assessment Act of 1969 (F.A.A.), Utah Code Ann. §§ 59–5–86 to –105 (1986).[1] Bell Mountain Corporation is the owner of the parcels of land, which lie on the foothills of the Wasatch Mountains adjacent to an exclusive residential area which Bell Moun-

---

1. In 1987, the legislature recodified the Act under Utah Code Ann. § 59–2–501 (1987) and renamed it the Farmland Assessment Act. None of the substantive provisions here at issue have been changed, but we refer to the 1969 Act for chronological accuracy.

tain has developed and continues to develop gradually on its land. For the years 1983, 1984, and 1985, Salt Lake County assessed the parcels as farmland. In 1986, the County denied F.A.A. status for the property, assessed it at market value, and applied the rollback tax. Bell Mountain appealed to the Commission. The Commission, in an informal hearing, decided that the County's assessment was proper. Pursuant to Bell Mountain's request for a rehearing, the Commission rendered a formal decision reinstating the seven parcels to F.A.A. status. The Commission found that, for the 1986 tax year, the cattle that pastured on the property were sold for $2,413.99. Although one dissenting commissioner felt that the statutory requirement "actively devoted to agricultural use" was not met by Bell Mountain, the Commission concluded that Bell Mountain met the preference criteria of section 59–5–87 in that the property exceeded five acres, produced an annual gross income in excess of $1,000 per year from agricultural use, and had been in agricultural use for the two immediately preceding years.

■ Our standard of review is governed by the Utah Administrative Procedures Act, Utah Code Ann. § 63–46b–22 (1989), inasmuch as all agency adjudicative proceedings here under review were commenced after January 1, 1988. Under that standard, we grant relief in this case only if the Commission's facts are not supported by substantial evidence when viewed in the light of the whole record, § 63–46b–16(4)(g), or that the Commission erroneously interpreted or applied the law, § 63–46b–16(4)(d). *See, generally Morton Int'l v. Utah State Tax Comm'n*, 814 P.2d 581 (1991) (discussing standard of review under APA).

■ The County first contends that the property is not "land which is actively devoted to agricultural use" as required by section 59–5–87 because Bell Mountain is a real estate developer and its agricultural activity on this land is nominal at best. The County in essence asks us to construe the term "actively devoted to agricultural use" as requiring that land be either farmed for profit or "primarily devoted" to agricultural use. See Annotation, *Taxes– Treatment of Agricultural Land*, 98 A.L.R.3d 916 (1980), for cases supporting this construction. We disposed of this issue in *Salt Lake County v. State Tax Commission*, 779 P.2d 1131 (Utah 1989), where this court rejected the limited interpretation the County attempts to place on the words "actively devoted," as the statute itself does not mandate exclusive or primary devotion to agricultural use. *Id.* at 1132–33.

■ In that case, the land in question was a buffer zone around a plant in which explosives were manufactured. On the land, wheat was raised and livestock grazed. We affirmed the State Tax Commission's decision that the land was actively devoted to agricultural use even though it also served an industrial use. *Id.* Similarly, in the instant case, the fact that the land is held primarily for residential development and that the grazing of cattle thereon is an incidental and secondary use does not disqualify the land from assessment under the F.A.A. so long as the acreage, income, and other requirements of section 59–5–89 are met. The very purpose of the F.A.A. is to allow land which has become valuable for a nonagricultural use to be assessed as agricultural land as long as agricultural activity is actually carried on and the minimum qualifying requirements of the act are satisfied. *See Township of Andover v. Kymer*, 140 N.J.Super. 399, 356 A.2d 418 (1976) (the fact that an owner holds his land for resale does not disqualify it from farmland assessment).

One of the commissioners, in his dissent, pointed out the high cost to the taxpayers of affording F.A.A. status to large acreages of land ripe for residential development simply because the acreage temporarily sustains a few head of cattle. Any evil in this regard cannot be corrected in this forum. Only the legislature has the power to curb excesses which may be permitted by the present statutory minimum qualifying requirements.

■ The County next contends that the Commission erred by granting F.A.A. sta-

tus to the full 431.41 acres because Bell Mountain admitted that its cattle grazed on only about 100 acres. The remainder of the acreage was not grazed because of its steepness and inaccessibility due to gullies and ravines. We note at the outset that only land which is "used for agricultural purposes" is permitted by the Utah Constitution to be assessed at less than its fair market value. Article 13, section 3(2) provides:

Land used for agricultural purposes may, as the Legislature prescribes, be assessed according to its value for agricultural use without regard to the value it may have for other purposes.

In implementation of that constitutional provision, the legislature has defined "land in agricultural use" in Utah Code Ann. § 59–5–88 (now § 59–2–502) as follows:

Land shall be deemed to be in agricultural use when devoted to the raising of plants and animals useful to man including but not limited to: forages and sod crops; grains and feed crops; dairy animals, poultry, livestock, including beef cattle, sheep, swine, horses, ponies, mules or goats, including the breeding or grazing of any or all of such animals....

In *Township of Andover v. Kymer*, 140 N.J.Super. 399, 356 A.2d 418 (1976), the court was confronted with whether to grant farmland assessment status to a 210–acre farm of which only between 41 and 100 acres were actually under cultivation. It did not appear that any part of the land was used for the grazing of animals. The township tax assessor refused to assess as farmland the acreage that was wooded or swampy or consisted of rocky terrain with no evidence of cultivation. The court held that the woody, swampy, rocky acreage with a marginal value for agricultural or horticultural use may be given the special farmland tax treatment as long as those areas are a "part of, appurtenant to, or reasonably required for the purpose of maintaining the land actually devoted to farming use, particularly where it has been part of the farm for a number of years." 140 N.J.Super. at 403, 356 A.2d at 420. In holding that the assessor should have given the special farmland tax treat-

ment to the entire tract, the court, while acknowledging that the primary goal of the legislation was to save the family farm and to provide farmers with some economic relief by permitting their lands to be taxed at a lower assessment, also stated that another objective was to encourage the maintenance and preservation of open space and beauty of the countryside. 140 N.J.Super. at 404, 356 A.2d at 420.

In contrast, in Utah, farmland assessment can be extended to property only if it is in agricultural use. Our constitution and statutes do not permit it for open spaces which may have aesthetic value. Land to be given F.A.A. status therefore must comply with the legislative definition of agricultural use in section 59–5–88, set out above. In so holding, we recognize, as did the New Jersey court, that it would be a "staggering undertaking" for the assessor to have to extract nonfertile areas from every tract of farmland. 140 N.J.Super. at 404–05, 356 A.2d at 420–21. The statute need not be applied as the law of the Medes and the Persians. We are aware that even on the best of farms there may be relatively small areas which are not strictly "devoted to the raising of plants and animals useful to man." We also acknowledge that nonproductive areas sometimes may be reasonably required for the purpose of maintaining the land actually devoted to production. A certain amount of liberality must be indulged in if the legislative purpose and common sense are to prevail.

However, in the instant case, it appears that as much as 75 percent of the acreage sought to be given preferential assessment is not grazed by the cattle or accessed by them for watering, shelter, or any other purposes. This acreage is not reasonably required for the purpose of maintaining the land actually grazed, nor does it in any way support activity on that land. Under these circumstances, it cannot be successfully maintained that such acreage is in agricultural use. Furthermore, the seven separately described tracts were not ever part of a unit farm, as was the case in *Township of Andover v. Kymer*. For all that appears in the record, the seven parcels

may have been acquired by the taxpayer at different times and the only relationship between them is simply that they meet each other at one or more of their corners. We do not believe that it was the intent of the constitutional authorization in article 13, section 3(2) and of the implementing statutes that tracts not in actual agricultural use could be bootstrapped onto a core of agricultural property and thereby spread the preferential tax assessment to a wide area.

■ Finally, the County challenges the Commission's findings that Bell Mountain obtained its income through an arm's-length transaction. Property tax regulation no. 9, located in A12–14–1: Administration Regulations—Farmland Assessment Act of 1969, provides:

a. Gross income, Section 59–5–87(1) and gross sales, Section 59–5–89(2) shall both be interpreted to mean "gross sales."

b. All sales must be made at arms [sic] length in order to qualify.

c. Income as required for F.A.A. qualification under section 59–5–87 shall be determined as being tax reportable and will be substantiated by appropriate income tax schedules.

Bell Mountain pays taxes on an accrual basis. It recorded the income here at issue as earned in September 1985, though payment was not received until January of the following year. The income from the cut and wrapped meat, sold to two shareholders of Bell Mountain, was shown as $1,000. Another $1,413.99 was received in 1986. There was substantial evidence in the record that the prices paid by the two shareholders were at or near live market prices published by the Department of Agriculture for the same period for slaughter steers in the same weight range. The evidence was also uncontroverted that receipts and checks produced reflected the sales, that the shareholders and Bell Mountain were separate entities at all times, and that the income had been reported on Bell Mountain's tax returns. Therefore, there is no error in the Commission's finding that the sales were arm's-length transactions.

The decision of the Commission is reversed, and the case is remanded to the Commission for the purpose of granting F.A.A. status to only that part of the acreage which is in agricultural use as explained in this opinion.

HALL, C.J., and STEWART, J., concur.

ZIMMERMAN, Justice (concurring and dissenting):

I join Justice Howe's opinion, except that portion apparently holding that the State Tax Commission did not properly determine that all of the land in question was "devoted to" agricultural purposes. First, the Commission considered the facts and determined that the land was eligible for the exemption, including the parts of the parcels that were too steep and gullied for the cattle to graze upon. Justice Howe's opinion reverses this essentially factual determination without explaining, other than in the most general way, how the record evidence fails to support the Commission's conclusion.

Second, even if the legal standard applied by the Commission to determine whether land is "devoted to" agricultural purposes was incorrect, as Justice Howe's opinion suggests, the court today has not explained to the Commission or to the bar what the proper standard is. Some language in the opinion can be read to suggest that the exemption is to be denied only with respect to those tracts of which no part is physically used for agricultural purposes. However, other language suggests that the exemption is not available for any portion of a parcel "not in actual agricultural use."

If the former standard is the appropriate test, then I assume the Commission can administer the law without much difficulty (assuming that we explain to them in some greater detail how to determine, as the majority has apparently done in this case, when land is "devoted to" raising livestock and how to determine whether "nonproductive areas [are] reasonably required for the purpose of maintaining the land actually devoted to production"). But if the Commission must deduct from every parcel of

land otherwise eligible for the exemption the acreage that is not either devoted to agriculture or a nonproductive area reasonably required for the maintaining of land so devoted, then we have created precisely the "staggering undertaking" for the assessor warned against by the New Jersey court in *Township of Andover v. Kymer*, 140 N.J.Super. 399, 404–05, 356 A.2d 418, 420 (1976). It is no answer to say blithely that the statute "need not be applied as the law of the Medes and the Persians." That will hardly be helpful guidance to the Commission. The Commission must apply the law as we construe it. By our construction, we act as the Medes and the Persians, and we have created an absurdly unadministerable law.

DURHAM, J., concurs with the concurring and dissenting opinion of ZIMMERMAN, J.