**BOARD OF EQUALIZATION OF SALT LAKE COUNTY, State of Utah, Petitioner,**

v.

**UTAH STATE TAX COMMISSION EX REL. Thomas E. and Mary Lu E. JUDD, Respondents.**

No. 910256.

Supreme Court of Utah.

Jan. 20, 1993.

---

R. Paul Van Dam, Salt Lake City, for State of Utah.

Brian L. Tarbet, Salt Lake City, for Utah State Tax Com'n.

David E. Yocum, Bill Thomas Peters, Salt Lake City, for Salt Lake County.

Kent Winterholler, Julia C. Attwood, Salt Lake City, for Judds.

ZIMMERMAN, Justice:

The Board of Equalization of Salt Lake County appeals from a May 8, 1991, order of the Utah State Tax Commission. The Commission found that certain real property owned by Thomas E. and Mary Lu E. Judd qualified for assessment under the Farmland Assessment Act ("FAA"). Utah Code Ann. §§ 59-2-501 to -515. The Board of Equalization argues, inter alia, that the Commission erred in allowing the subject property to qualify for assessment under the FAA because it had been platted, subdivided, recorded, improved with curbs, gutters, and utilities, and put up for sale as residential building lots. Because the FAA appears to allow such a result, we disagree with the Board and affirm the Commission's order.

The tax at issue in this appeal is property tax.[1] The Judds seek assessment of twelve improved and developed subdivision lots under the FAA. The issue faced by the Commission below was whether the real property in question qualified for the so-called "greenbelt assessment" under the FAA for the tax year beginning January 1, 1989.

Prior to 1980, the Judds owned certain real property in Salt Lake County consisting of two contiguous parcels. For clarity, we term one parcel "the subdivision parcel" and the other "the Judd farm." In 1976, the Judds applied for a greenbelt tax assessment of both parcels as a single unit under the FAA. The Judds' application was accepted, and their property was thereafter assessed under the FAA.

In December of 1980, the Judds entered into an agreement to sell the subdivision parcel to Jim Pappas, who intended to develop it into a residential subdivision. As consideration for conveying the land to Pappas, the Judds were to receive $25,000 cash and title to lots 35 to 50, inclusive, improved with curbs, gutters, and utilities. In furtherance of the agreement with Pappas, the Judds conveyed the entire subdivision parcel to McGhie Land Title Company, in trust, to be held until the improvements to that parcel had been completed and the plat recorded. In 1983, Pappas recorded a plat for the subdivision parcel with the Salt Lake County Recorder.

On or about August 7, 1984, the Judds and Pappas executed another agreement, modifying their 1980 agreement, in which the Judds exchanged their interest in lots 35 to 50 for Pappas's interest in lots 1 through 16. Lots 1 through 16 were on that portion of the subdivision property immediately adjacent to the Judd farm. This substitution of lots presumably took place so that the Judds could continue to take advantage of the lower greenbelt assessment provided by the FAA pending the retail sale of the lots. Ultimately, lots 1 through 16 were conveyed to the Judds in fee simple, with curbs, gutters, and utilities installed at Mr. Pappas's expense. After 1984 but prior to 1987, the Judds sold lots

---

1. The material facts are not in dispute. Unless otherwise indicated, the facts as set forth herein are taken from the Commission's findings of fact, conclusions of law, and final order dated May 8, 1991.

1, 2, 3, and 16 to third parties who have built or are in the process of building residential homes on the lots.

The property that is the subject of this appeal consists of twelve vacant lots, 4 through 15, retained by the Judds. These lots, each 1/4 acre, lie side by side running north to south and are immediately adjacent to the Judd farm to the east. The Judd farm has qualified for greenbelt valuation under the FAA during all years material to this appeal. From 1987 through 1989, lots 4 through 15 were fenced off from the rest of the subdivision to the west, but there was no fence between the lots and the Judd farm. During these three years, lots 4 through 15 and the Judd farm were operated as a single agricultural unit.[2] Neither the Judds nor their lessees maintained records of the agricultural income derived solely from lots 4 through 15. However, the record shows that more than $1,000 in gross agricultural income was derived from the unit formed by lots 4 through 15 and the Judd farm in 1987 and 1989. At all times, lots 4 through 15 were for sale.

The dispositive issue on appeal is whether the Utah State Tax Commission has properly concluded as a matter of law that certain property qualifies for assessment under the FAA when that property (i) has been sold to a developer, subdivided, and platted, as evidenced by a recorded subdivision plat map; (ii) improved with curbs, gutters, and utilities; (iii) conveyed back to the original owner as part of the consideration for the original conveyance of a larger parcel; and (iv) offered for sale as residential building lots, some of which were sold. We hold that the Commission's conclusion was correct.

■ Generally, land is assessed for property tax purposes according to its "highest and best" use. The FAA provides an exception to the foregoing rule by allowing assessment of land according to its agricultural value (termed by the parties as the "greenbelt assessment"), even if some other use might result in a higher value. The FAA sets forth certain criteria that must be met before agricultural land qualifies for the greenbelt assessment and, consequently, lower property taxes:

(1) For general property tax purposes, the value of land under this part is the value which the land has for agricultural use if the land:

(a) is not less than five contiguous acres in area, except where devoted to agricultural use in conjunction with other eligible acreage or as provided under Subsection (3);

(b) has a gross income from agricultural use, not including rental income, of at least $1,000 per year;

(c) is actively devoted to agricultural use; and

(d) has been devoted to agricultural use for at least two successive years immediately preceding the tax year in issue.

Utah Code, Ann. § 59–2–503 (1989) (amended 1992).[3]

Whether lots 4 through 15 qualify for greenbelt assessment under the FAA is a question of statutory construction. We give no deference to an administrative agency's interpretation of a statute absent certain circumstances, none of which exist here. *Chris & Dick's Lumber & Hardware v. Tax Comm'n*, 791 P.2d 511, 513–14 (Utah 1990).

■ We find that lots 4 through 15 comply with the four statutory requirements for greenbelt assessment. First, although lots 4 through 15 are collectively

---

**2.** In 1987, Stanley Diamond rented and grew wheat on the property comprised of lots 4 through 15 and the Judd farm. After the wheat was harvested, Bateman Farms replaced Diamond as the lessee. Bateman Farms cultivated the land and then placed it in a cropland retirement program administered by the United States Department of Agriculture for the 1988 crop year. During the fall of 1988, Bateman

Farms planted wheat, which was harvested during the summer of 1989. Subsequently, Bateman Farms again placed the combined property in the federal cropland retirement program for the 1990 crop year.

**3.** The legislature amended the FAA in 1992, 1992 Utah Laws ch. 235, which may affect the

less than five acres, we think the five-acre requirement is met in this case because lots 4 through 15 and the twenty-nine-acre Judd farm have been farmed as a single agricultural unit since 1987.[4]

■ Second, while no accounts were kept on income derived from lots 4 through 15 alone, the record indicates that together with the Judd farm, the combined property produced the statutory minimum of $1,000 per year. Mr. Judd testified that the income on the combined property during 1989, the tax year in question, was approximately $2,000. Nothing in the record undermines this testimony. Accordingly, taking lots 4 through 15 and the Judd farm combined as the relevant parcel for consideration under the FAA, the minimum income requirement is also satisfied.

■ Third, lots 4 through 15 were "actively devoted to agricultural use." While this phrase is not expressly defined by the FAA, this court has applied it in two instances in a manner that supports the Commission here. In *Salt Lake County ex rel. County Board of Equalization v. State Tax Commission ex rel. Kennecott Corp.*, 779 P.2d 1131 (Utah 1989), undeveloped property owned by Kennecott was leased to Hercules as a buffer zone and then subleased to others for grazing livestock and growing wheat. The issue was whether the land qualified for preferential greenbelt tax treatment under the FAA. *Id.* at 1132. We held that it did. Rejecting the argument that the word "devoted" in the FAA requires exclusive agricultural use, we concluded that land may be actively devoted to multiple purposes. *Id.* at 1133.

If one of the purposes is agricultural, the land can qualify for greenbelt assessment under the FAA. The second case, *Salt Lake County ex rel. County Board of Equalization v. State Tax Commission of Utah ex rel. Bell Mountain Corp.*, 819 P.2d 776 (Utah 1991), involved a similar issue: Is undeveloped land owned by a real estate developer on which agricultural activity is nominal "actively devoted to agricultural use"? We concluded:

> [T]he fact that the land is held primarily for residential development and that the grazing of cattle thereon is an incidental and secondary use does not disqualify the land from assessment under the [FAA] so long as the acreage, income, and other requirements of section 59–5–89 [now recodified at section 59–2–503(1)] are met. The very purpose of the [FAA] is to allow land which has become valuable for a nonagricultural use to be assessed as agricultural land as long as agricultural activity is actually carried on and the minimum qualifying requirements of the act are satisfied.

*Id.* at 778.

■ Returning to the present case, even though lots 4 through 15 have been developed and offered for sale on a lot-by-lot basis for residential purposes, they are still "actively devoted to agricultural use" as defined by *Kennecott* and *Bell Mountain*.

■ Although lots 4 through 15 appear to qualify for the FAA greenbelt assessment, it certainly can be argued that this use of the statute does not comport with its purpose. In enacting the FAA's predecessor statute in 1969, the legislature recog-

---

analysis here. We address the FAA only as it existed in 1989.

4. The Board argues that lots 4 through 15 were "separated" from the Judd farm under section 59–2–510 of the Code which reads:

> Separation of a part of the land which is being valued, assessed, and taxed under this part, either by conveyance or other action of the owner of the land, for a use other than agricultural, subjects the land which is separated to liability for the applicable roll-back tax, but does not impair the continuance of

agricultural use valuation, assessment, and taxation for the remaining land if it continues to meet the requirements of this part.

This section does not define "separation," nor does it prevent reannexation of separated land to land that has always qualified for greenbelt assessment. We think that even if lots 4 through 15 were separated from the Judd farm, the Judds subsequently regained possession of the land and treated it as part of their farming operation. Lots 4 through 15 and the Judd farm are fenced as one contiguous unit and otherwise have been treated as a single agricultural unit.

nized that urban growth was encroaching on rural areas and that if farmland was taxed at market value, farmers whose properties were located near expanding urban areas would find it difficult to continue to devote their property to low-profit farming operations. Thus, the purpose of the FAA was to benefit those individuals and entities that continued to use land for agricultural purposes, particularly when the property was located near urban development. This suggests that the statute was not intended to benefit farmers who have developed and improved land once used exclusively as agricultural land—land that is now being sold as improved residential building lots in a platted subdivision.

But whatever the purposes of the statute might have been, its language, as construed by *Kennecott* and *Bell Mountain,* can be used as a tax loophole by almost any real estate developer. We see no principled way to avoid this result. The statute allows the Judds to sell off individual parcels of land as subdivided building lots, while at the same time allowing the remaining unsold building lots to qualify for greenbelt assessment. We recognize that our decision today may make instant farmers or stock raisers out of every real estate developer with five or more acres of land, but the power to remedy such abuse of the FAA lies with the legislature.

We have considered the Board's other arguments and find them to be without merit. Consequently, we affirm the Commission's order.

HALL, C.J., HOWE, A.C.J., and STEWART and DURHAM, JJ., concur.