**COUNTY BOARD OF EQUALIZATION OF WASATCH COUNTY, State of Utah, Petitioner,**

v.

**STICHTING MAYFLOWER RECREATIONAL FONDS, Stichting Mayflower Fonds, and Utah State Tax Commission, Respondents.**

No. 960280–CA.

Court of Appeals of Utah.

July 25, 1997.

Daniel H. Matthews, Heber City, Bill Thomas Peters and Joseph T. Dunbeck, Jr., Salt Lake City, for Petitioner.

Jan Graham, Kelly W. Wright, and John C. McCarrey, Salt Lake City, for Respondent Utah Tax Commission.

E. Craig Smay, Salt Lake City, for Respondent Mayflower.

Before GREENWOOD, JACKSON and ORME, JJ.

ORME, Judge:

The Wasatch County Board of Equalization (the County) seeks review of an order of the Utah State Tax Commission (the Commission) finding that certain real property owned by Stichting Mayflower Recreational Fonds (Mayflower) qualified for preferential greenbelt tax treatment under the Farmland Assessment Act (the FAA) for the tax years 1992 and 1993. We affirm in part and reverse in part.

## FACTS [1]

Mayflower owns several tracts of undeveloped land in Wasatch County, comprising approximately 3,420 acres. The property is split up generally into two tracts: a northern tract, lying on the north arm of what is now the Jordanelle Reservoir and straddling Summit and Wasatch Counties, and a southern tract, which lies along the new U.S. 40 freeway. The two large tracts of Mayflower's land are divided essentially into four parcels. Employing titles used on some of the maps in the record, we refer to these parcels as (1) the North Property, (2) the East Park Subdivision Property, (3) the Property Subject to Density Determination, and (4) the "other" property. Most important for our purposes is the property referred to as the "other" property.

The "other" property consists of about 1,495 acres, lying south and west of property

---

1. The material facts in this case are not in dispute. Accordingly, unless otherwise indicated, the facts as set forth in this opinion are taken from the Commission's Findings of Fact, Conclusions of Law, and Final Order dated August 25, 1995.

owned by Mayflower and leased to Deer Valley Ski Resort. This property is not bounded by any fences, and its topography consists mostly of very steep and rocky slopes, ranging in elevation from 7,000 to 9,400 feet.

Beginning in the early 1980s, all four parcels of Mayflower's land, including the "other" property, were leased by Mayflower to Gillmore Livestock Corporation for grazing sheep and cattle. Although the written lease between Mayflower and Gillmore Livestock has since expired, it is undisputed that a valid oral lease continued in effect for 1992 and 1993, the tax years at issue in this case.

In 1984, Mayflower applied for preferential greenbelt tax treatment for its North Property, the Property Subject to Density Determination, and its "other" property. Mayflower's request was granted by Wasatch County, and Mayflower's properties benefitted accordingly until 1992.

In 1992, in an effort to check the compliance of various property owners with the newly amended FAA, the Wasatch County Assessor reviewed the greenbelt status of Mayflower's property and determined that the property was not being put to the agricultural use required to qualify for greenbelt assessment. Accordingly, the assessor terminated Mayflower's greenbelt status, imposed a rollback tax on the property for the years 1988 to 1992, and assessed the property at its full fair market value for the 1993 tax year. Mayflower challenged this action by filing an appeal with the County. The County affirmed the assessor's determination, whereupon Mayflower filed an appeal with the Utah State Tax Commission. The Commission conducted a formal hearing on the issue of whether Mayflower's property was properly removed from greenbelt status.

At the hearing, Luke Gillmore, an officer of Gillmore Livestock, testified concerning the use to which Mayflower's property had been put. He testified that his company leased Mayflower's property for the purpose of summer grazing and that such activity has occurred since the early 1980s. Mr. Gillmore testified that during 1992 and 1993, the grazing activities took place predominantly during May to November, when the company moved cattle and sheep from its own property in Salt Lake and Tooele Counties to the properties in Summit and Wasatch Counties.

About 2,500 to 3,000 sheep and about 100 to 300 head of cattle were continuously grazed on Mayflower's property during the 1992–93 seasons. During that time, when the animals were brought from Salt Lake and Tooele Counties to be dropped off on Mayflower's property, they were usually unloaded near the North Property. The animals were never unloaded onto the "other" property. Mr. Gillmore testified, however, that once the animals were unloaded, they roamed over the entire area, which consisted mainly of Mayflower and Gillmore property. According to Mr. Gillmore, the animals were attracted to areas with water, including the Mayflower Mines area, lying within the Property Subject to Density Determination, and the McCune Hollow region, lying just south of Mayflower's North Property.

In describing Mayflower's "other" property, Mr. Gillmore testified that this area is "very steep," with almost no water. To the west of the "other" property is an area known as Bonanza Flat, which contains streams and creeks. Between the "other" property and Bonanza Flat lies Lone Hill, which is an area with more of a gentle slope and rolling meadows. Mr. Gillmore testified that Gillmore Livestock has not been leading its sheep onto the "other" property for two reasons: insufficient water in the area and the rise in the domestic dog population. Since domestic dogs pose a serious threat to sheep, Mr. Gillmore testified that he did not want his sheep going onto the "other" property near the Bonanza Flat region, but that sheep will be sheep and periodically stray into this area on their own.[2] Gillmore testi-

2. To establish the risk posed by dogs to the sheep, Mayflower called Denny Lytle, an employee of the Commission with experience and background in agricultural economics. Mr. Lytle testified that when dogs attack a herd of sheep "it's usually a bloody mess" and that once the dogs start attacking the sheep, they do not stop at just one or two. Such killing can have serious, negative effects on a livestock producer's business, given the existing low lamb and wool prices. Thus, according to Lytle, a livestock producer

fied that he solicited the help of Summit County officials to control the dogs that preyed on his sheep. Although some help was received, the problem had grown out of control. Mr. Gillmore did not know the exact number of sheep that would periodically migrate into the "other" property, but he testified that as soon as he or one of his herdsmen discovered it, an effort was made to herd them back down into safer areas. Gillmore continued to lease the "other" property from Mayflower, but made no "extra payment" for it because of the danger in using the area for sheep grazing. Although this area had thus experienced diminished use in recent years, it had been used extensively as a "sheep camp" up until 1986 or 1987. Gillmore also testified that the "other" property is used "very little" by the cattle. Like the sheep, the cattle would periodically migrate on their own into this area and also into the area leased by Deer Valley.

According to Gillmore, the North Property and the Property Subject to Density Determination were being used to the extent of fifty percent of their capacity. However, he admitted that the use of the "other" property, which led up to the Bonanza Flat area, had been used substantially less than its capacity to graze animals, due to the change in conditions, i.e., the growth in the domestic dog population in and around the area leased to Deer Valley.

On the basis of this and other evidence, the Commission reversed the County's determination, finding that in spite of the diminished agricultural use of a portion of the "other" property, there was no change in the use of the property. Accordingly, the Commission found that for the 1992 and 1993 tax years, all of Mayflower's property that had previously been given "greenbelt" tax treatment continued to qualify for such preferential treatment under the FAA. The Commission also found that the imposition of the rollback tax was improper and ordered it removed. The County filed the instant petition for review with the Utah Supreme Court, which

cannot afford to incur "substantial predator losses."

3. "Land in agricultural use" is defined under the FAA as follows:

transferred the case to this court. *See* Utah Code Ann. § 78-2-2(4) (1996).

## ISSUES AND STANDARDS OF REVIEW

■ The parties have raised several issues on appeal, but essentially, we must decide whether the Commission erred in determining that Mayflower's property satisfied the minimum qualifying requirements of the FAA for the 1992 and 1993 tax years. We review the Commission's determinations for correctness, granting no particular deference to the Commission. *See Board of Equalization v. Utah State Tax Comm'n ex rel. Judd,* 846 P.2d 1292, 1295 (Utah 1993). *See also* Utah Code Ann. § 59-1-610(1)(b) (1996) (stating appellate court grants no deference to Commission's conclusions of law, unless statute at issue contains explicit grant of discretion to Commission).

## FARMLAND ASSESSMENT ACT

■ As a general rule, real property in Utah is assessed for property tax purposes "according to its 'highest and best' use." *Judd,* 846 P.2d at 1295. An exception to this rule was created in 1969 with enactment of the FAA, which allows assessment of qualifying real property according to its agricultural value. *See id.* In enacting the FAA in 1969,

> the legislature recognized that urban growth was encroaching on rural areas and that if farmland was taxed at market value, farmers whose properties were located near expanding urban areas would find it difficult to continue to devote their property to low-profit farming operations. Thus, the purpose of the FAA was to benefit those individuals and entities that continued to use land for agricultural purposes, particularly when the property was located near urban development.

*Id.* at 1296-97.

For land to qualify for preferential "greenbelt" tax treatment under the FAA, the land must be "land in agricultural use"[3] and, in

(a) land devoted to the raising of useful plants and animals, such as:
   (i) forages and sod crops;
   (ii) grains and feed crops;
   (iii) livestock as defined in section 59-2-102;

addition, meet the minimum qualifying requirements of the act. *See Salt Lake County ex rel. County Bd. of Equalization v. State Tax Comm'n ex rel. Bell Mountain Corp.,* 819 P.2d 776, 778 (Utah 1991). These minimum requirements were as follows:

> For general property tax purposes, the value of land under this part is the value which the land has for agricultural use if the land:
>
> (a) is not less than five contiguous acres in area, except where devoted to agricultural use in conjunction with other eligible acreage or as provided under Subsection (3);
>
> (b) has a gross income from agricultural use, not including rental income, of at least $1,000 per year;
>
> (c) is actively devoted to agricultural use; and
>
> (d) has been devoted to agricultural use for at least two successive years immediately preceding the tax year in issue.

Utah Code Ann. § 59-2-503(1) (1989).

The term "actively devoted to agricultural use" was left undefined under the FAA until 1992, when the Legislature amended the above stated criteria. *See* Farmland Assessment Act, 1992 Utah Laws ch. 235, § 2, at 919 (codified at Utah Code Ann. § 59-2-503(2)(a) (1996)). In the amendment, the Legislature repealed the $1,000 income production requirement and added a definition for "actively devoted to agricultural use," which, in effect, added a different and more stringent production requirement. *See id.*

The amended act, which became effective January 1, 1993, now requires that the property (1) consist of at least five contiguous acres, (2) be "actively devoted to agricultural use," and (3) have been "actively devoted to agricultural use" for at least two successive years immediately preceding the tax year in issue. Utah Code Ann. § 59-2-503(1) (1996). Under the amended FAA, the phrase "active-ly devoted to agricultural use" means that "the land produces in excess of 50% of the average agricultural production per acre for the given type of land and the given county or area." *Id.* § 59-2-503(2)(a). Because the tax years involved in this case are 1992 and 1993, we must analyze the issue at bar by applying the pre-amendment criteria for 1992 and the amended criteria for 1993.

## APPLICATION OF PRE–AMENDMENT CRITERIA

■ It is undisputed that Mayflower met the acreage requirement and the $1,000 annual income production requirement for the 1992 tax year. *See* Utah Code Ann. § 59-2-503(1)(a), (b) (1989). Notwithstanding Mayflower's compliance with these requirements, the County contends that Mayflower failed to meet the FAA's requirement that the land be "actively devoted to agricultural use."

Whether property is "actively devoted to agricultural use" under the earlier version of the FAA has been addressed on three different occasions by the Utah Supreme Court. *See Board of Equalization v. Utah State Tax Comm'n ex rel. Judd,* 846 P.2d 1292 (Utah 1993); *Salt Lake County ex rel. County Bd. of Equalization v. State Tax Comm'n ex rel. Bell Mountain Corp.,* 819 P.2d 776 (Utah 1991); *Salt Lake County ex rel. County Bd. of Equalization v. State Tax Comm'n ex rel. Kennecott Corp.,* 779 P.2d 1131 (Utah 1989).

In *Kennecott,* undeveloped property owned by Kennecott Corporation was leased to Hercules, Inc., as a buffer zone and then subleased to others for grazing livestock and growing wheat. The lease agreement restricted Hercules in its use of the subject property, in that no habitable buildings could be constructed and no explosives or flammable materials could be stored on the property. The issue was whether the land qualified for preferential tax treatment under the FAA. *See* 779 P.2d at 1132.

---

(iv) trees and fruits; or

(v) vegetables, nursery, floral, and ornamental stock.

Utah Code Ann. § 59-2-502(1) (1989). In 1992, this definition was amended, substituting "with a reasonable expectation of profit, including" for "such as" in subsection (a). *See* Farmland As-sessment Act, 1992 Utah Laws ch. 235, § 1, at 919 (codified at Utah Code Ann. § 59-2-502(1)(a) (1996)). The newly amended version, with its profit expectancy language, governs tax year 1993, while the other year in issue, 1992, is governed by the prior version.

The Court in *Kennecott* recognized the general rule that taxation statutes in Utah are to be liberally construed in favor of the taxpayer. *See id.* The Court then stated that "[t]he legislature has determined that if land in Utah is used for agricultural purposes, that land is qualified for assessment under the Act." *Id.* at 1132–33. Applying these rules, the Court held that the "actively devoted to" requirement did not mean exclusive use, as urged by the county on appeal. *Id.* at 1133. The Court stated that the county's interpretation of the "actively devoted to" requirement under the FAA would be required only if the statute read "exclusively" or even "primarily" devoted to an agricultural use. *Id.* at 1132. Because no such terms appeared in the statute, the Court rejected the county's argument.

The Utah Supreme Court again confronted the issue of whether land was actively devoted to agricultural use in *Bell Mountain*. In that case, a real estate developer owned approximately 431 acres of undeveloped land. The landowner sought greenbelt assessment for the entire 431 acre parcel, of which only about 100 acres were actually grazed by cattle. The remainder of the property was not grazed due to its steep topography and its relative inaccessibility. *See* 819 P.2d at 778–79.

Similar to the arguments made in *Kennecott*, the county first asserted that the property should have been denied greenbelt assessment because agricultural use on the property was nominal at best. *See id.* at 778. Noting that this argument was disposed of in its *Kennecott* decision, the Supreme Court in *Bell Mountain* stated that

the fact that the land is held primarily for residential development and that the grazing of cattle thereon is an incidental and secondary use does not disqualify the land from assessment under the [FAA] so long as the acreage, income, and other requirements of [the FAA] are met. The very purpose of the [FAA] is to allow land which has become valuable for a nonagricultural use to be assessed as agricultural land as long as agricultural activity is actually carried on and the minimum qualifying requirements of the act are satisfied.

*Id.* The Court concluded by noting that, despite the high cost to taxpayers of affording preferential tax treatment "to large acreages of land ripe for residential development simply because the acreage temporarily sustains a few head of cattle," the courts are not the proper forum for remedying abuses under the FAA. *Id.*

The county in *Bell Mountain* also argued that preferential tax treatment should not have been granted to the entire 431 acre tract because only 100 acres were actually used by the landowner for grazing purposes. *See id.* at 778–79. The Supreme Court agreed with this argument. Noting that "even on the best of farms there may be relatively small areas which are not strictly 'devoted to the raising of plants and animals useful to man'" and acknowledging "that nonproductive areas sometimes may be reasonably required for the purpose of maintaining the land actually devoted to production," *id.* at 779, the Court denied greenbelt assessment for 331 of the 431 acres. *See id.* at 779–80. The Court reasoned that

as much as 75 percent of the acreage sought to be given preferential assessment is not grazed by the cattle or accessed by them for watering, shelter, or any other purposes. This acreage is not reasonably required for the purpose of maintaining the land actually grazed, nor does it in any way support activity on that land.

*Id.* at 779.

The issue of whether land was "actively devoted to agricultural use" under the earlier version of the FAA was again addressed by our Supreme Court in *Judd*. In that case, the Court considered two contiguous parcels of land owned by the Judds, one of which was used for farming operations. Beginning in 1976, these two parcels qualified for assessment under the FAA as a single unit. In 1980, the Judds entered into an agreement to sell one of the parcels to a real estate developer. As part of the consideration for conveying the land to the developer, the Judds were to receive several of the lots, improved with curbs, gutters, and utilities. Several years later, this agreement was modified, and the Judds agreed to exchange their improved lots for other improved lots immediately ad-

jacent to their farm. This modification took place presumably to allow the substituted lots to be benefitted by the FAA. *See* 846 P.2d at 1294. At issue was whether twelve lots, retained by the Judds after several were sold to third parties, qualified for greenbelt tax treatment, when those lots "had been platted, subdivided, recorded, improved with curbs, gutters, and utilities, and put up for sale as residential building lots." *Id.*

In finding that all of the Judds' property qualified for assessment under the FAA, the Court focused on the fact that the twelve lots at issue were farmed in the past as a single agricultural unit with the remaining farm parcel. *See id.* at 1295–96. In addressing the acreage requirement, the Court stated that "although [the twelve lots] are collectively less than five acres, we think the five-acre requirement is met in this case because lots 4 through 15 and the twenty-nine acre Judd farm have been farmed as a single agricultural unit since 1987." *Id.* at 1295–96. The Court also noted that the combined property produced the statutory minimum of $1,000 per year. *See id.* at 1296.

Without much further explanation, the Court simply stated that, given the interpretations of the phrase "actively devoted to agricultural use" in *Kennecott* and *Bell Mountain*, the developed lots qualified for greenbelt assessment. *See id.* The Court conceded that this result arguably did not comport with the FAA's purpose, since its decision "may make instant farmers or stock raisers out of every real estate developer with five or more acres of land," but the Court emphasized, as it did in *Bell Mountain*, that the power to remedy any abuses under the FAA lies with the Legislature. *Id.* at 1297.

Turning to the facts of the instant case, the County contends that the "actively devoted to agricultural use" requirement under the earlier statute was not satisfied as far as the "other" property was concerned. The County's argument is based on the undisputed fact that Gillmore Livestock, as lessee, attempted to keep its livestock away from the "other" property and that, as a result of these efforts, only a few of the animals managed to wander to that area on their own and actual-ly graze the land. In essence, the County argues that the FAA requires more purposeful and active use of the subject property, not just unintentional and casual use. We disagree with the County's reading of the pre-amendment version of the FAA.

It is undisputed in this case that the "other" property was actually used by Gillmore Livestock for grazing purposes, albeit unintentionally. Luke Gillmore testified that, although the "sheep camp" and deliberate grazing of "the whole herd" on the "other" property were discontinued in the late 1980s, animals still grazed in that area. He also testified that "different bunches" of sheep still grazed the area, but in a significantly diminished way because of the domestic dogs that would wander onto the "other" property from the area leased to Deer Valley. Likewise, he testified that cattle periodically roamed into the areas making up the "other" property.

Although use of the "other" property constituted more casual and unintentional agricultural use, we are nonetheless persuaded that the Commission was correct in finding that the "other" property was "actively devoted to agricultural use" and thus qualified for greenbelt assessment under the FAA for the 1992 tax year. Somewhat similar to the 100–acre parcel in *Bell Mountain*, which was held primarily for residential purposes—and only casually or incidentally used for agricultural purposes—the property here was also used for agricultural purposes, although that use was unintentional. Furthermore, the express language of the FAA, prior to the 1992 amendments, contained no language relating to the intentions of the landowner or lessee. Indeed, the language of the statute suggests that the intentions of the landowner are wholly irrelevant when deciding whether realty qualifies for assessment under the prior version of the FAA, "as long as agricultural activity is actually carried on and the minimum qualifying requirements of the act are satisfied." *Bell Mountain*, 819 P.2d at 778.

## APPLICATION OF 1992 AMENDMENTS

The County concedes on appeal that the acreage requirement was met for the 1993 tax year. However, the County argues that

the "actively devoted to agricultural use" requirement was not satisfied, in that Mayflower's property failed to meet the agricultural production requirement. In this regard, the Commission found that Mayflower had established, by a preponderance of the evidence, that Gillmore's grazing activities used fifty percent of the carrying capacity of *all* acres grazed, including the "other" property.

■ As discussed above, the Legislature amended the applicable FAA criteria in 1992. This was done in apparent response to the perceived abuse under the earlier version of the act and to the Utah Supreme Court's decisions in *Bell Mountain* and *Judd*. *Cf. Judd*, 846 P.2d at 1297 ("[T]he power to remedy ... abuse of the FAA lies with the legislature."); *Bell Mountain*, 819 P.2d at 778 ("Only the legislature has the power to curb excesses which may [have been] permitted by the [older] statutory minimum qualifying requirements."). The amendments effectively make agricultural output and production determinative of whether land is "actively devoted to agricultural use." In enacting the 1992 amendments to the FAA, it is clear that the Legislature intended to deny favorable "greenbelt" assessment treatment to those who are not "really" engaged in agriculture for its own sake, while allowing preferential assessment for those individuals and entities making reasonable, sustained efforts to farm or graze the land.[4]

Under the amended FAA, the Legislature has provided local governments and their assessors with three possible methods for determining agricultural production levels for a given county, or area, and a given type of land. In this regard, local governments are to consult production levels reported in the current publication of *Utah Agricultural Statistics*, the current crop budgets developed and published by Utah State University, or other acceptable standards of agricultural production designated by the Commission, by rule. *See* Utah Code Ann. § 59–2–503(2)(b) (1996).

In this case, Denny Lytle, an employee of the Commission in charge of overseeing compliance with tax assessment laws at the county level, testified that there were no published production levels applicable to Mayflower's properties which could be relied upon. He testified that Utah State University did not publish "crop" budgets related to grazing and that the Commission had not promulgated a rule as contemplated by the amendment to the FAA.

Thus, according to Mr. Lytle, in administering the amended law, the Commission has published an interim production guideline for land used for grazing. It establishes four categories of grazing land and the corresponding production requirements. These classifications are based on the climate and site of the land, soil profile, and vegetative condition. They establish how many animal unit months (AUMs) of grazing the property can reasonably produce.[5]

---

4. In considering the Senate Floor debates in support of the 1992 amendments, it is clear that the purpose behind the amendments was to require farming on land with the *reasonable expectation of profit* and that "if you run a farm, you run a real farm" and not a "hobby farm." Tape of Utah Senate Floor Debates, 49th Legislature, General Session (February 3, 1992) (statement of Carl Hendricksen). Indeed, as stated by Mr. Hendricksen, those affected most by the amendments are those landowners that "have chosen to buy five or six acres and keep riding horses on it for themselves and their friends." *Id.* Tom Bingham of the Utah Farm Bureau, also an advocate of the 1992 amendments, stated that the intent of the 1992 production amendments was to "take the dollar figure out of [the FAA] that we believe really has little relevance at this time and replace it with a provision that measures a *reasonable effort to farm the ground.*" Tape of Utah

Senate Floor Debates, 49th Legislature, General Session (February 3, 1992) (emphasis added).

5. An AUM is the amount of forage required to maintain one head of cattle or equivalent animal in "thrifty condition" for one month. The AUM capacity of land is calculated by multiplying the total acres grazed by the property's graze classification. A property's graze classification is based on several factors, including the site of the land and the land's soil profile and vegetative condition, as well as how many animals the property can maintain for one month. Because the FAA requires that the actual production of the property be at least 50% of the adopted standard, *see* Utah Code Ann. § 59–2–503(2)(a) (1996), the AUM capacity is then cut in half to calculate the total AUMs required for minimal satisfaction of the production requirement.

The County contends that the Commission's finding regarding the total agricultural production of Mayflower's property was erroneous because it was based on a calculation of AUMs using an incomplete acreage figure. According to the County, the acreage in the Commission's production computation did not include, *inter alia*, the "other" property. Thus, according to the County, if the additional acreage had been considered by the Commission in its production computation, the agricultural production requirement would not have been met in this case, and Mayflower's property, in its entirety, would not have qualified for assessment under the FAA. The thrust of the County's argument regarding the Commission's AUM analysis hinges on increasing the total amount of acreage used in the AUM calculation by the number of acres constituting the "other" property.

Mayflower argues in response that the acreage figure applied by the Commission in making its AUM determination is supported by a stipulation entered into by the parties, which basically set the total acreage for all of the Mayflower properties. The County argues that this stipulation applied only to the acreage of the land as it related to the question of the land to be assessed, and not as it related to the question of acreage for AUM calculation.

The fundamental conceptual mistake made by both parties, however, is in assuming that the North Property, the Property Subject to Density Determination, and the "other" property must be looked at as an integrated whole in determining whether the production requirement was met, notwithstanding the distinctive nature of the "other" property. The facts presented at the hearing indicated that the "other" property was, for all practical purposes, not contiguous to the North Property or the Property Subject to Density Determination. Moreover, it was shown that in recent years, including the 1993 tax year, Gillmore Livestock did not pay Mayflower rent allocable to the "other" property, despite its inclusion in the lease agreement. The "other" property is also not grazed like the remaining parcels, in light of the substantial efforts made to keep livestock *out* of the "other" property. Indeed, if the "other" property were fenced off and rendered completely unavailable to Gillmore Livestock's sheep, it would not adversely affect the grazing operation in any way.

The "other" property in this case is much like the 331–acre parcel in *Bell Mountain.* In *Bell Mountain,* the Court stated that the 331 acres of steep and inaccessible land, which was considered distinct from the remaining 100 acres and ultimately denied greenbelt assessment, was not reasonably required to maintain the remaining 100 acres actually grazed, nor did it support any activity on those remaining 100 acres. *See* 819 P.2d at 779. Similarly, the acres making up the "other" property in this case, although grazed in the past with the other parcels of Mayflower's land, is not now reasonably required for the purpose of maintaining the North Property or the Property Subject to Density Determination, nor does it support in any way activity on those parcels. These geographic and qualitative factors compel the conclusion that the "other" property should have been considered separately from the remaining parcels in determining whether it met the amended production requirement.

From all that appears in the record in this case, the Commission failed to consider the "other" property as separate and distinct from the remaining parcels. Instead, the Commission applied an "all or nothing approach." The County, which itself has pursued an "all or nothing" theory, does not dispute the fact that the acreage figure used by the Commission in computing AUMs represented the total number of acres grazed, exclusive of the "other" property. To dilute the productivity of each acre, the County seeks to have the total acreage of the "other" property included in the AUM equation. It follows that if the "other" property were treated separately in determining whether it alone met the production requirement, the North Property and the Property Subject to Density Determination would satisfy the production requirement for the 1993 tax year.

■ In light of our conclusion that the "other" property should have been treated as separate from the remaining parcels in regard to the production requirement, and in

light of the fact that the AUM calculation was made according to the acres making up the grazed parcels exclusive of the "other" property, we must conclude that the "other" property did not satisfy the production requirement and must be taxed at its fair market value, while the remaining parcels most certainly did and should benefit from assessment under the FAA.[6]

## CONCLUSION

The property at issue in this case qualified for preferential "greenbelt" assessment under the FAA for the 1992 tax year. The property was not less than five contiguous acres in area, produced a gross income from agricultural use of at least $1,000 per year, and was actively devoted to agricultural use for 1992, as well as for at least two successive years immediately preceding 1992. However, the "actively devoted to agricultural use" requirement, as that term has been defined by the Legislature under the 1992 amendments to the FAA, was not satisfied for the 1993 tax year as far as the "other" property is concerned. Therefore, we reverse the Commission's decision as it pertains to the "other" property for 1993. Otherwise, the Tax Commission is affirmed.

GREENWOOD and JACKSON, JJ., concur.

---

**6.** Because the "other" property became ineligible for farmland assessment solely as a result of the 1992 amendments to § 59–2–503, it is not subject to the rollback tax for any prior tax years at issue in this case. *See* Utah Code Ann. § 59–2–506(7) (1996). We therefore affirm the Commission's ruling overturning the imposition of the rollback tax for the 1988–92 tax years.

The Commission suggested at oral argument that this appeal is more easily disposed of by applying the FAA's waiver provision under Utah Code Ann. § 59–2–503(5) (1996). This provision states, in pertinent part, that the Commission may grant a waiver of the agricultural production requirement for the tax year in issue upon proof that "the failure to meet the agricultural production requirements for that tax year was due to no fault or act of the owner, purchaser, or lessee." *Id.* § 59–2–503(5)(b). The Commission contends that the failure to meet the agricultural production requirement in this case, as far as the "other" property is concerned, is due to the danger posed by predatory dogs. According to the Commission, this constitutes a condition outside the control of Gillmore Livestock, thereby triggering the waiver provision. We decline to resolve the appeal on this basis, given the fact that the parties did not address the waiver provision at the hearing below and did not adequately brief the provision on appeal. *Cf. State v. Lopez,* 886 P.2d 1105, 1113 (Utah 1994) (stating general rule that issues not raised at trial cannot be raised for first time on appeal); *State v. Yates,* 834 P.2d 599, 602 (Utah.Ct.App.1992) ("This court has routinely declined to consider arguments which are not adequately briefed on appeal.").